**Opinion filed July 30, 2021**



# In The

# Eleventh Court of Appeals

_____

## No. 11-18-00290-CR

_____

## SHAWN PATRICK LAYTON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 266th District Court**
**Erath County, Texas**
**Trial Court Cause No. CR15036**

## M E M O R A N D U M   O P I N I O N

A jury convicted Shawn Patrick Layton of aggravated assault with a deadly weapon and assessed his punishment at imprisonment for twenty years in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2019). The trial court sentenced Appellant accordingly and ordered Appellant to pay restitution in the amount of $44,528.73, consisting of $41,056.36 to the Office of the Attorney General, Crime Victims' Compensation fund for the victim's medical bills and

$3,472.37 to the Erath County district clerk for court-appointed attorney's fees. We modify and affirm.

Appellant brings three issues on appeal. First, that the trial court erred during the guilt/innocence phase of trial by failing to include in the jury charge an instruction regarding accomplice-witness testimony. Second, that the trial court erred during the punishment phase of trial by failing to comply with the provisions of Article 37.07, section (4) of the Texas Code of Criminal Procedure in its instructions to the jury regarding parole. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (West Supp. 2020). Lastly, that the trial court erred in taxing court-appointed attorney's fees to Appellant in the judgment.

*Background Facts*

On the evening of December 10, 2017, Stephenville Police Officer Eric Hunt and his partner responded to a call of shots fired at the Oak Tree West Apartments in Stephenville. After finding no suspicious activity, the officers left the apartment complex. Around 1:18 a.m. on December 11, the officers responded to another call from the complex, this time reporting that a female had been shot. The female victim was identified as Jamie Richards. Officer Hunt found Richards lying on the floor of her apartment with a large pool of blood near her head. A shell casing was also located on the floor near Richards's head.

Crystal Warren, a resident in the same apartment complex as Richards, heard the gunshot on the night of December 10. Warren looked out her window and saw a man standing in the grassy area by the pool; he was wearing dark clothes and a hat. According to Warren's testimony, the man dropped down onto his stomach in the grass as if he were trying to hide.

Richards testified that she was a student at Tarleton State University in the fall of 2017 and lived at the Oak Tree West Apartments. On the evening of December 10, 2017, Richards was in her bedroom watching Netflix when she heard

2

a loud "bang" on her front door.  When she heard a second "bang," she looked out the peephole but could not see anyone outside her apartment.  Richards opened the door, looked to the right, and saw nobody there.  She looked to the left and saw someone whom she did not recognize holding a gun.  The unknown person, wearing a mask and dark clothing, shot Richards in the face, causing her to fall backward into her apartment.  Richards could not reach her phone to call for help and could not successfully dial 9-1-1 using Siri.  She lay on the floor for approximately four hours before help arrived.

Brad Green, an investigator with the Stephenville Police Department, responded to the scene where Richards had been shot.  Investigator Green observed the pool of blood, shell casing, and a shoe lying on the floor just inside the doorway.  He also observed a bullet hole in Richards's door and wall.  Investigator Green believed that Richards had opened the door, leaned out, and was shot.  According to Green, the bullet went through Richards's head, through the open apartment door, and then into the drywall of the apartment.

Kevin Fincher, an investigator with the Stephenville Police Department, suspected that the shooter had gone to the wrong apartment.  Investigator Fincher asked the apartment manager whether any residents had asked to break their lease and move after the shooting occurred.  The apartment manager identified Jeremy Lao as the only resident who had asked to break his lease and move following the shooting.

Investigator Fincher interviewed Lao, and Lao expressed his belief that he was the intended victim of the shooting after he had "fronted" Appellant $800 worth of marihuana to sell.  Lao said that Appellant never paid him for the marihuana and that Lao had written it off as a loss.  According to Lao, Appellant suspected Lao of burglarizing his house in order to get even.  Lao had received a phone call from Appellant on the day of the shooting, but Lao did not answer.  Appellant's phone

3

records also showed that Lao and Appellant had discussed the drug debt owed by Appellant.

Appellant was interviewed by Investigator Fincher with the consent of Appellant's attorney. Appellant denied purchasing or possessing a handgun or ammunition. Appellant also told Investigator Fincher that he was not the kind of person to shoot someone.

Investigators also interviewed Brittany Kennedy, Appellant's neighbor. Appellant had asked Kennedy if she had heard about the shooting. Kennedy testified that Appellant told her, "[T]hat would teach [Lao] . . . from robbing somebody who owed him money." Appellant then asked whether the victim was alive or dead, to which Kennedy responded that she was in "critical" condition. Appellant answered, "Oh, f--k." Appellant's phone records also included a text message from Appellant to Kennedy at 8:12 p.m. on the night of the shooting saying, "Hell yeah that's what I'm talking about I've got a score to settle it should take me about an hour k." At 10:18 p.m., immediately after the shooting, Appellant sent another text to Kennedy that said, "K I'm still down had some s--t to handle it's handled bet."

Based upon their investigation, officers obtained a search warrant for Appellant's home. Crime Scene Investigator Jeanine Parmentier entered and photographed Appellant's home. She photographed a cell phone, rolling papers, syringes, lighters, and loose marihuana. Investigators also found a 9mm Luger round stamped with the letters "CBC" in a bedroom nightstand. The shell casing found at the scene of the shooting was also a 9mm Luger with CBC stamped on it.

Investigators also searched Appellant's pickup. Inside his pickup, investigators found dark-colored clothing, an insulated mask and scarf, and a holster under the seat. Investigators found a 9mm Luger round on the ground near the pickup. The handgun used in this shooting was never recovered.

4

Edward Gordon, an investigator with the Erath County District Attorney's Office, conducted interviews with Kennedy and Amber Talamantez. Talamantez told investigators about a pair of dark work gloves that Appellant was wearing on the night of the shooting. Investigators then reentered Appellant's pickup and located a pair of black, rubberized work gloves. Vicki Hall, a Trace Evidence Examiner with the Tarrant County Medical Examiner's Office and Forensic Laboratories, testified that she found gunshot residue on the gloves, scarf, and ski mask found in connection with this case.

Officer Justin McGuire of the Granbury Police Department was a member of the SWAT team that secured Appellant's residence prior to the execution of the search warrant. After SWAT deployed a flash bang device, Appellant exited his home and was arrested. Appellant made res gestae statements such as "I didn't do anything," "I didn't do it," and "Oh, y'all think I shot that girl."

On November 20, 2017, Appellant sold a .308 rifle to Star Arms. On the same day, Appellant purchased a 9mm Bryco Jennings handgun and a box of 9mm Magtech "full metal jacket" ammunition from Daniel Byrd, an employee of Star Arms. Appellant told Byrd that Appellant's house had been robbed and that he was looking for a handgun for protection. Scott Moffett, the manager at Star Arms, testified that Magtech uses the CBC stamp on their ammunition.

Jeremy Lanier, a Detective with the Stephenville Police Department, testified that he responded to a property dispute call at Appellant's home on November 26, 2017, received permission to enter Appellant's home, and subsequently observed a silver and black semiautomatic handgun on a dresser in Appellant's room. Appellant told Detective Lanier that he had purchased the pistol to protect his home because Appellant had been "robbed."

Jamie Becker, a Senior Firearm and Toolmark Examiner with the Tarrant County Crime Laboratory, testified that the bullet recovered from

5

Richards's apartment was a full metal jacket bullet consistent with 9mm Luger ammunition. Becker also testified that all of the cartridges recovered in the investigation of this shooting were consistent in brand and caliber. According to Becker, the fired cartridge came from a class of firearms produced by the same manufacturer as the manufacturer of the firearm Appellant purchased from Byrd at Star Arms.

Chris Ledbetter, a Special Agent with the Texas Department of Public Safety, conducted forensic examinations on two cell phones obtained during the investigation of this case. According to Agent Ledbetter, one phone was used by Appellant and the other was used by Talamantez. Agent Ledbetter testified that at approximately 7:45 p.m. on the night of the shooting, Appellant placed two phone calls to Lao. Lisa Upton, an employee of the Texas Department of Public Safety's telecommunications research analysis center, conducted cell tower mapping based on data pulled from the two phones. Upton testified that between 8:00 p.m. and midnight on the night of the shooting, Appellant's phone and Talamantez's phone used the cell tower closest to the Oak Tree West Apartments.

Talamantez began living with Appellant around Thanksgiving of 2017. Appellant told Talamantez that he owed a "Chinese guy" money for drugs. Appellant mentioned that he thought that the "Chinese guy" was the one who had burglarized Appellant's home. Talamantez accompanied Appellant to the Oak Tree West Apartments on the night of the shooting. Appellant was dressed in a black shirt and pants and told Talamantez that he wanted her to go knock on the door. Instead, Talamantez went back to the pickup and waited for Appellant. Shortly thereafter, Talamantez heard a gunshot. Appellant ran back to the pickup, jumped in the passenger seat, and screamed: "Go, go, go!"

The next day, Appellant attempted to sell his vehicle to a dealership, but was unsuccessful. Appellant told Talamantez that the victim was the girlfriend of Lao

6

and asked what he should do with his pistol. Appellant mentioned the possibility of filing off the serial numbers and throwing the handgun into a dumpster. Talamantez admitted to wiping fingerprints off the bullets after the shooting. When the SWAT team arrived at Appellant's home, Appellant told Talamantez to "stick to the story."

The jury returned a guilty verdict. During the punishment phase of trial, Richards's mother, Jessica Hogland, testified that the shooting left her daughter a quadriplegic and that she requires around-the-clock medical care every day. Richards's stepfather, Eddie Hogland, testified as to the effects the shooting had on Richards and her family. Richards testified as to the effects of the shooting and her rehabilitation. Doctors have told Richards that she will never walk again. The jury returned a verdict of twenty years in prison and a fine of $10,000, the maximum punishment available for the offense charged.

## *Issue One*

In his first issue, Appellant asserts that the trial court erred by failing to sua sponte provide the jury an accomplice-witness instruction under Article 38.14 of the Texas Code of Criminal Procedure regarding the testimony of Talamantez. *See* CRIM. PROC. art. 38.14 (West 2005). Appellant claims that Talamantez was an accomplice witness, as a matter of law, who testified at trial and, therefore, the trial court should have submitted a jury instruction regarding testimony of an accomplice witness. Appellant contends that failure to do so deprived Appellant of his right to a fair trial.

## *Standard of Review*

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Review of an alleged charge error is a two-step process; we first determine whether the jury instruction is erroneous, then we analyze the error for harm. *Id.* If the charge is not erroneous, our analysis ends. *Id.* If error occurred and was the subject of a

7

timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which means no more than that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). "In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless." *Id.*; *see also Carter v. State*, No. 11-17-00264-CR, 2019 WL 4316812, at \*5 (Tex. App.— Eastland, 2019, no pet). In all situations, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. When, as in this case, the error was not objected to, reversal is proper only if the error caused actual, egregious harm to the defendant. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). Such a determination must be based on a finding of "actual rather than theoretical harm." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)).

*Analysis*

Appellant acknowledges that he did not request an accomplice-witness instruction for this witness. Appellant asserts that Talamantez was an accomplice witness as a matter of law because she was charged with the same offense in connection with the same criminal incident. He contends that the trial court's error egregiously harmed him because the failure to include the instruction was fundamental error that deprived Appellant of his right to a fair and impartial trial. We disagree.

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission

8

of the offense." CRIM. PROC. art. 38.14; *see State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016). If an accomplice to the offense testifies for the State, the accomplice's testimony must be corroborated by non-accomplice evidence that tends to "connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). When the issue is raised by the evidence, the trial court must instruct the jury on the accomplice-witness rule because it is the "law applicable to the case." *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013); *see* CRIM. PROC. art. 36.14 (West 2007). For the purpose of our analysis, we will assume that the trial court erred by failing to include an accomplice-witness instruction for the testimony of Talamantez.

"Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Ambrose*, 487 S.W.3d at 598 (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002); *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). Appellant asserts that Talamantez is the only witness that places Appellant at the scene of the shooting when the shooting occurred. Talamantez also made other incriminating statements against Appellant, including her testimony that Appellant told her to "stick to the story" when the police arrived at Appellant's home. Appellant asserts that, given the indispensable nature of Talamantez's testimony to the case, the trial court's failure to include the accomplice-witness instruction requiring that her testimony be corroborated by other evidence resulted in Appellant not receiving a fair and impartial trial. Appellant argues that, had the jury been properly instructed, it would likely not have found Talamantez's testimony sufficiently corroborated and that, therefore, Appellant would have been acquitted.

The State's evidence at trial that counters Appellant's argument includes evidence that Lao attempted to break his lease immediately after the shooting occurred. Lao believed he was the intended target because Appellant was angry with Lao over past drug transactions between the two of them. There were two calls from Appellant to Loa on the evening of the shooting. Lao's apartment was numbered 15D, and the victim's apartment was 16D in the same complex. Appellant, when questioned, denied ownership or possession of a handgun or ammunition. But a 9mm Luger round stamped with CBC was found in Appellant's bedroom nightstand. The shell casing found at the scene was a 9mm Luger casing, full metal jacket, stamped with CBC. A 9mm Luger round was found near Appellant's pickup. The bullet from the crime scene was a full metal jacket consistent with 9mm Luger ammunition. There was testimony of Appellant's purchase of a 9mm handgun with a box of full metal jacket ammunition stamped CBC. When first searched, there was a handgun observed on Appellant's dresser. Investigator Fincher also testified that Kennedy was contacted by Appellant on the day following the shooting. Kennedy testified that Appellant told her where the shooting occurred before the location was public knowledge, also stating "maybe that will teach them to steal from people who owe them money." Additionally, the pair of gloves, ski mask, scarf, and other dark clothing found in Appellant's pickup tested positive for gunshot residue, linking Appellant to the shooting. Cell phone mapping and data examined at trial also linked Appellant to the crime and placed Appellant near Richards's apartment.

Viewing the record as a whole, including the testimony of Talamantez, we agree with the State that the trial court's failure to include an accomplice-witness instruction was not error requiring reversal. Because there was strong corroborative evidence from multiple witnesses tending to connect Appellant to the offense, the totality of the record fails to show that he was egregiously harmed by the omission

10

of the accomplice-witness instruction. *See Ambrose*, 487 S.W.3d at 598–99. We overrule Appellant's first issue.

*Issue Two*

In his second issue, Appellant argues that the trial court erred during the punishment phase of trial by failing to comply with the provisions of Article 37.07, section 4 of the Texas Code of Criminal Procedure in its instructions to the jury regarding parole. Appellant claims that the trial court failed to include all of the language required by Article 37.07, section 4, in that it failed to instruct the jury that, "[i]f the defendant is sentenced to a term of less than four years, he must serve at least two years before the defendant is eligible for parole." CRIM. PROC. art. 37.07, § 4(a). Appellant asserts that the trial court's failure to include the statutorily required language deprived Appellant of his right to a fair trial.

*Analysis*

We must review Appellant's second issue under the same, well-recognized standard of review for alleged jury-charge error that we set forth above when addressing Appellant's first issue. Article 37.07, section 4 of the Texas Code of Criminal Procedure sets out various jury instructions pertaining to parole law that are to be included in the trial court's charge to the jury on punishment. CRIM. PROC. art. 37.07, § 4; *see Taylor v. State*, 233 S.W.3d 356, 359 (Tex. Crim. App. 2007). These instructions explain generally the concepts of good conduct time and parole, state the defendant's eligibility for parole in terms of calendar years or sentence portion, and state that no one can predict whether parole or good conduct time might be applied to the defendant. *See Luquis v. State*, 72 S.W.3d 355, 366 (Tex. Crim. App. 2002).

The jury was not instructed with the complete language from Article 37.07, section 4(a). *See* CRIM. PROC. art. 37.07, § 4(a). Under the version of Article 37.07,

11

section 4(a) that was in effect at the time of Appellant's trial, the jury should have been charged as follows:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time the defendant may earn. *If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole.* Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.
>
> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Former CRIM. PROC. art. 37.07, § 4(a) (emphasis added); *see* Act of May 26, 2015, 84th Leg., R.S., ch. 770, § 2.08, 2015 Tex. Gen. Laws 2321, 2367 (effective January 1, 2017).[1]

> Instead, the jury was charged, in pertinent part:
>
> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.

---

[1]The legislature amended Article 37.07, section 4 in 2019—after Appellant's trial. *See* Act of May 15, 2019, 86th Leg., R.S., H.B. 1279, §§ 1–2 (codified at CRIM. PROC. art. 37.07, § 4). The 2019 changes apply to a defendant sentenced on or after September 1, 2019. Because Appellant was sentenced prior to September 1, 2019, the former version of the statute is applicable to this case.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Appellant complains, and we agree, that the instruction was erroneous because the trial court's instruction failed to inform the jury that if Appellant were sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. *See Soza v. State*, No. 05-17-00590-CR, 2018 WL 3387249, at *1, n.1 (Tex. App.—Dallas July 12, 2018, pet. ref'd) (mem. op., not designated for publication) ("The statutory instruction is constitutional and mandatory, and the precise language of Article 37.07 is prohibited from alteration." (citing *Luquis*, 72 S.W.3d at 363)).

Having determined that the trial court's instruction was erroneous, we must now turn to the question of harm. Because Appellant did not object to the erroneous jury charge, the error is reversible only if the error caused him egregious harm. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). In examining the record to determine whether such harm occurred, we consider the four *Almanza* factors: (1) the entire jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial court as a whole. *Almanza*, 686 S.W.2d at 171. Errors resulting in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)

13

(citing *Almanza*, 686 S.W.2d at 171).  Applying the *Almanza* factors, we conclude that the record shows that Appellant suffered no egregious harm here.

First, the charge as a whole mitigates against the finding of egregious harm. The overarching purpose of the Article 37.07, section 4(a) instruction, as it existed at the time of Appellant's trial, was to inform jurors of the concepts of "good conduct time" and parole "as a general proposition, but to prohibit the jury from using its notions of parole or 'good conduct time' in any calculus in assessing the appropriate punishment."  *Luquis*, 72 S.W.3d at 360.  Here, the jury was instructed not to consider how parole eligibility or good conduct time might apply to Appellant when assessing punishment.  The jury was also instructed that it was not to consider the extent to which good conduct or parole time may be awarded to or forfeited by Appellant.  Additionally, the jury was informed of the range of possible punishment and instructed to limit its deliberations, under the law and the evidence in this case, to the question of punishment.  Assuming, as we must, that the jury followed these instructions, no harm would result.  *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).  Furthermore, Appellant does not point to any evidence rebutting this presumption, and we find none.  *See Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006); *Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.).  Thus, the first factor does not weigh in favor of concluding that Appellant was egregiously harmed by the erroneous instruction.

With respect to the second *Almanza* factor—the state of the evidence—we note that Appellant does not contend that the evidence was insufficient to find him guilty of the offense of aggravated assault with a deadly weapon for which he was convicted.  The punishment range for this offense was a term of two to twenty years imprisonment and a possible fine not to exceed $10,000.  PENAL § 12.33.  The jury assessed the maximum possible punishment.  Thus, had the jury considered the possibility of parole, the sentence imposed was not in the range potentially impacted

14

by the erroneous charge (a term of less than four years). Therefore, this factor does not weigh in favor of concluding that Appellant was egregiously harmed by the erroneous instruction.

The third *Almanza* factor pertains to the arguments of counsel. Closing argument by Appellant's trial counsel focused on whether a probated sentence was an appropriate punishment for Appellant, based on the assertion that this was an accident and that this was Appellant's first offense. Appellant's counsel also mentioned the possibility of parole. The State argued that Appellant should receive the maximum sentence based on the heinousness of his actions. However, we note that no emphasis was placed on the erroneous instruction. Both the State and Appellant's counsel refrained from urging the jury to assess a greater or lesser sentence based upon any potential good conduct time, aside from Appellant's trial counsel's effort to explain how parole and probated sentences could operate. Therefore, the third *Almanza* factor does not weigh in favor of concluding that Appellant was egregiously harmed by the erroneous instruction.

As for the fourth factor of any other relevant information revealed by the record, nothing in the record suggests that the jury discussed, considered, or attempted to apply any aspect of parole law to Appellant's punishment determination despite the charge's admonition not to do so. Further, nothing in the record indicates that the jury was misled by the parole law charge given or that the jury increased his sentence based on the absence of the portion of the Article 37.07, section 4(a) instruction regarding a minimum of two years' service for a two-to-four-year sentence. *See Soza*, 2018 WL 3387249, at \*3. Thus, the fourth factor does not weigh in favor of concluding that Appellant was egregiously harmed by the erroneous instruction.

The jury deliberated for less than fifteen minutes. It did not send any notes expressing confusion regarding the punishment charge. The jury assessed

15

Appellant's punishment at twenty years' confinement and a $10,000 fine. This punishment was within the proscribed range and is "unsurprising" considering the nature of Appellant's actions. *See Luquis*, 72 S.W.3d at 367–68 ("Although appellant received the maximum sentence possible, life in prison, that is unsurprising given appellant's crime, his cavalier confession, and his abysmal prior criminal record."). Furthermore, although Appellant did receive the maximum sentence, the other *Almanza* factors mitigate against a finding of egregious harm. *See Igo*, 210 S.W.3d at 647.

We are unable to conclude that Appellant suffered egregious harm from the erroneous jury instruction concerning parole eligibility. We believe Appellant received a twenty-year prison sentence and $10,000 fine from the jury because of the crime he committed rather than because of an erroneous understanding of parole law. Under the standards necessary to find egregious harm, we conclude that the erroneous jury instruction did not deprive Appellant of a fair and impartial trial or affect the very basis of the case, deprive him of a valuable right, or vitally affect a defensive theory. *See Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). We overrule Appellant's second issue.

### Issue Three

In his third issue, Appellant contends that it was an error for the trial court to order Appellant to pay $3,472.37 in court-appointed attorney's fees. Appellant asserts that it was improper to assess these fees against him because he was found to be indigent and remains so. We agree.

### Standard of Review

An indigent defendant cannot be taxed the cost of his or her court-appointed lawyer unless the trial court finds that the defendant has the financial resources to repay those costs in whole or in part. CRIM. PROC. art. 26.05(g); *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). A defendant's financial resources and

16

ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees. *Cates v. State*, 402 S.W.3d 250, 251 (Tex. Crim. App. 2013). A defendant who is determined by the trial court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial resources occurs. CRIM. PROC. art 26.04; *Cates*, 402 S.W.3d at 251.

*Analysis*

It is well settled that it is improper for a trial court to assess court-appointed attorney's fees against an indigent defendant. *Cates*, 402 S.W.3d at 251–52. The trial court evaluated Appellant's financial ability to hire an attorney and determined that he was indigent and entitled to be represented by appointed counsel. The judgment entered against Appellant includes an order for Appellant to pay $3,472.37 in court-appointed attorney's fees. Appellant asserts that this was error because there is nothing in the record that establishes that Appellant's status as an indigent defendant had changed. The State concedes error as to attorney's fees assessed against Appellant, and we agree with Appellant's contention that this was error.

Appellant was determined to be indigent, and there is nothing in the record to indicate that he is no longer indigent or that the trial court made any determination that Appellant had financial resources to pay for the costs of his court-appointed attorney. *See* CRIM. PROC. art. 26.05(g). Because the record does not demonstrate that the trial court found a material change in Appellant's financial circumstances, attorney's fees may not be assessed against him. *See* CRIM. PROC. arts. 26.04(p), 26.05(g). Accordingly, Appellant's third issue is sustained. We modify the trial court's judgment to delete any requirement that Appellant pay $3,472.37 for court-appointed attorney's fees.

*This Court's Ruling*

We modify the judgment of the trial court to delete any requirement that Appellant pay court-appointed attorney's fees. As modified, we affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


July 30, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.